UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES RAYMOND TOMLIN,

          Plaintiff,

                                    Civil Case No. 21-10641
v.                                  Honorable Linda V. Parker

KEN PERCY, CITY OF ST.
CLAIR SHORES, and
JOHN DOES I-III,

          Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56

This case arises from Plaintiff James Raymond Tomlin's arrest after he led City of St Clair Shores police officers on a high-speed chase. In a Complaint filed March 23, 2021, Mr. Tomlin asserts the following claims: (I) excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983 against the officer who initiated the arrest, Ken Percy; (II) failure to protect in violation of the Fourth Amendment under § 1983 against three unknown individuals; (III) municipal liability against the City of St. Clair Shores; (IV) assault against Officer Percy; (V) battery against Officer Percy; and (VI) intentional infliction of emotional distress against Officer Percy.

The matter is presently before the Court on a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 filed by Officer Percy and the City of St. Clair Shores (collectively "Defendants").  (ECF No. 16.)  The motion has been fully briefed.  (ECF Nos. 17, 19.)  In response to Defendants' motion, Mr. Tomlin concedes that his claims against the City of St. Clair Shores and John Does I-III (Counts II and III) are subject to dismissal.  Therefore, the Court is dismissing those counts and defendants with prejudice.  The Court held a hearing addressing Mr. Tomlin's remaining claims against Officer Percy on May 30, 2023.  For the reasons that follow, the Court concludes that Officer Percy is entitled to summary judgment with respect to Mr. Tomlin's claims.

## I.    Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case

and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). Notably, the trial court is not required to construct a party's argument from the record or search out facts from the record supporting those arguments. *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C.

3

Cir. 1988)) ("the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact"); *see also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied* 494 U.S. 1091 (1990) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."). The parties are required to designate with specificity the portions of the record such that the court can "readily identify the facts upon which the . . . party relies[.]" *InterRoyal Corp.*, 889 F.2d at 111.

## II.   **Factual Background**

At around 10:30 p.m. on June 28, 2019, the City of St. Clair Shores Police Department received a complaint from a female resident that her ex-boyfriend, Mr. Tomlin, was repeatedly driving by her home on his Harley Davidson motorcycle, revving the engine each time. (ECF No. 16-5 at Pg ID 120.) Officer Percy was dispatched to respond to the complaint. (ECF No. 16-7 at Pg ID 169.) As Officer Percy approached the complainant's residence, he passed Mr. Tomlin on his motorcycle. (*Id*. at Pg ID 184.) This encounter and the remainder of the incident

were captured on the dashboard camera of Officer Percy's patrol car.  (ECF No. 16-2 at 22:29:49.)[1]

After passing Mr. Tomlin, Officer Percy turned around and began following the motorcycle.  (*Id.* at 22:30:21.)  Mr. Tomlin accelerated and proceeded through a stop sign without stopping.  (*Id*.)  Officer Percy activated his emergency lights and siren but Mr. Tomlin did not pull over.  (*Id*. at 22:30:15.)  Mr. Tomlin continued through side-streets toward 12 Mile Road, turning eastbound onto 12 Mile Road and past another stop sign without stopping.  (*Id*. 22:30:21.)  The pursuit continued, with Mr. Tomlin driving through a red traffic light at the intersection of Little Mack Road and between vehicles stopped at a red traffic light at another intersection around I-94, which Mr. Tomlin also ignored.  (*Id*. at 22:30:24022:31:11.)  Officer Percy observed that his speed was 58 m.p.h. in a 45 m.p.h.-zone.  (ECF No. 16-5 at Pg ID 120.)

Mr. Tomlin eventually turned right onto a side street, Massachusetts Street, and the motorcycle turned perpendicular to the direction of the roadway.  (ECF No. 16-2 at 22:31:37.)  Officer Percy pulled up to the motorcycle as Mr. Tomlin got off it and began walking away.  (*Id*. 22:30:40.)  Although Mr. Tomlin was wearing a bandana over his head and sunglasses, his face is visible in the video and he

---

[1] The times listed throughout this decision are the time of day as indicated in the video as opposed to the counter for the video itself.

5

appears to have no injuries. (*Id.*) Officer Percy in fact testified that Mr. Tomlin was not bleeding when he dismounted his motorcycle. (ECF No. 16-7 at Pg ID 192.)

Officer Percy exited the vehicle with his taser in his left hand, pointed toward Mr. Tomlin, and directed Mr. Tomlin to "get on the ground." (ECF No. 16-2 at 22:30.) Mr. Tomlin ignored Officer Percy and began walking away. (*Id.* 22:31:43-22:31:52.) Officer Percy walked after Mr. Tomlin, twice repeating his command for Mr. Tomlin to get on the ground. (*Id.* at 22:31:49.) At this point, Mr. Tomlin was only partially in view of the dashboard camera but the record reflects that he got on one knee as Office Percy approached. (*Id.*; ECF No. 16-7 at Pg ID 185)

What happened next was primarily outside the view of the dashboard camera on Officer Percy's patrol car. (*See* ECF No. 16-2 at 22:31:52.) Also, Officer Percy did not grab the dash cam microphone from its cradle on the interior ceiling of the patrol car and attach it to his body as he exited the vehicle; therefore, any audio outside its range was not captured on the dash cam video. (ECF No. 16-7 at Pg ID 173.) According to Officer Percy, he used his right hand to push Mr. Tomlin's upper torso forward to the ground. (ECF No. 16-7 at Pg ID 186.) At that point, Officer Percy testified that he tried to return his taser to its holster on the left side of his utility belt but he missed the first couple of times because he was

6

directing it too low and was struggling with Mr. Tomlin.  (*Id*. at 186, 194; ECF No. 16-2 at 22:31:52.)

During his deposition in this matter, Mr. Tomlin testified that he does not have a lot of memory of the incident, indicating "[i]t's a blackout" and that if he had not watched the videotape, he "would have no recollection at all."  (ECF No. 16-6 at Pg ID 147-48.)  He recalls "[b]its and pieces here and there."  (*Id*. at Pg ID 147)  At one point during his deposition, Mr. Tomlin claimed that he immediately lay on the ground, face down, and put his hands in the air and that he did so voluntarily (*id.* at Pg ID 155, 156); [2] but then he subsequently indicated that his only recollection of what happened comes from watching the video (*see, e.g., id.* at Pg ID 155-56).  However, as indicated above, what happened after Mr. Tomlin dismounted his motorcycle is almost completely outside the view of the patrol car's dashboard camera.  The video does not show whether Mr. Tomlin independently went to the ground, Officer Percy pushed him to the ground, or something in between.  (*See* ECF No. 16-2.)

_____

[2] This version contradicts the facts recited in Mr. Tomlin's response brief and his counsel's assertions during the motion hearing.  (*See, e.g.*, ECF No. 360 (indicating that Officer Percy instructed Mr. Tomlin three times to get on the ground and approached with his taser pulled before Mr. Tomlin kneeled down on the ground and that Officer Percy then pushed Mr. Tomlin to the ground).

In the video, one can see Officer Percy's left elbow rise and fall several times. (*Id.* at 22:31:53.) Mr. Tomlin claims these movements show Officer Percy "pistol-whipping" him. (ECF No. 17 at Pg ID 358, 360.)

Officer Percy then tried to grab Mr. Tomlin's arm to handcuff Mr. Tomlin but Mr. Tomlin had put his arms straight out and was resisting.[3] (ECF No. 16-7 at Pg Id 186-87, 189.) Officer Percy told Mr. Tomlin to "stop resisting" but Mr. Tomlin would not bring his arm back. (*Id.*) At 10:32 p.m., City of St. Clair Shores Police Officers Donald McLeod and Trevor Head arrived on scene and went to assist Officer Percy. (ECF No. 16-3 at 22:32:01; ECF No. 16-4 at 22:31:57.)

Officers McLeod and Head did take their dashboard camera microphones when they exited their patrol cars, which picked up the audio portion of what followed their arrival. Their patrol cars also were parked in positions that enabled their dashboard cameras to capture what transpired. On the videos from their dashboard cameras, Officer McLeod can be heard telling Mr. Tomlin to stop resisting. (ECF No. 16-4 at 22:32:07.) One or more of the officers subsequently

---

[3] At the motion hearing, Mr. Tomlin's counsel insisted that his client was not resisting and claimed that officers are trained to say "stop resisting" to protect themselves from any claim of excessive force. There is no evidence to support either assertion, however. Mr. Tomlin claimed repeatedly during his deposition that he was unconscious the first time Officer Percy allegedly struck him with a weapon and that he had no independent recollection of what happened but remembers only what he saw on the videotape. (*See, e.g.*, ECF No. 16-6 at Pg ID 157.)

told Mr. Tomlin to "stop it." (*Id.* at 22:32:09-10.) The officers succeeded in handcuffing Mr. Tomlin and rolled him over. (ECF No. 16-3 at 22:32:41.)

At this point, Mr. Tomlin, who was intoxicated, said "I'm an asshole," to which Officer Percy responded, "You're an asshole" and "I don't give a fuck about you." (ECF No. 16-3 at 22:32:49-22:32:52.) Mr. Tomlin responded, "apparently not," and another officer can be heard saying, in part, "take off running . . . you little bitch." (*Id.* at 22:32:57-22:32:58.) The officers saw bleeding from a laceration above Mr. Tomlin's right eye and Officer Head called for EMS.[4] (ECF No. 16-4 at 22:32:46; ECF No. 16-7 at Pg ID 192.) Officer Head reported that EMS was coming and to sit Mr. Tomlin down, which the officers did. (ECF No. 16-4 at Pg ID 22:33:02.)

Officer Head or McLeod then told Mr. Tomlin, "You're not supposed to run from the police." (ECF No. 16-4 at 22:33:35.) Mr. Tomlin responded, in part, "police aren't supposed to beat people up." (*Id.* at 22:33:42.) The same officer asked, "You get beat up?" (*Id.* at 22:33:46.) After some discussion back and forth regarding Mr. Tomlin being on his ex-girlfriend's street and why he was there, Mr.

---

[4] In at least one of the dashcam videos, one of the officers reports that he got blood on his hands and needed to wash it off. (*See, e.g.*, ECF No. 16-3 at 22:33:11; 22:33:54.) This officer appears to be Officer McLeod as the audio is heard on the video from his dashboard camera and he then walked to his patrol car. (*Id.* at 22:34:02-22:34:10.) Officer Percy also testified that he got some blood on him, which he thought was on both of his hands but was not sure. (ECF No. 16-7 at Pg ID 194-95, 199.)

Tomlin asked why his face was bleeding.  (*Id*. at 22:35:13.)  Officer Head or McLeod responded: "You just got in an accident," to which Mr. Tomlin replied, "Well if that's the story you guys will stick to."  (*Id*. at 22:35:15-22:35:19.)  Mr. Tomlin then said, "You're no better than anyone else.  You're a fucking abuser." (*Id*. at 22:35:20-22:35:23.)  What one of the officers said next and part of Mr. Tomlin's response are inaudible but Mr. Tomlin can be heard saying something about punching a guy in the face and "you're a liar."  (*Id*. at 22:35:32.)  Mr. Tomlin later repeated: "You did punch me . . . punch a guy in the face . . . punched me in the face a few times."  (22:37:46-22:40:26.)

By 10:42 p.m., EMTs arrived and began attending to Mr. Tomlin.  (*Id*. at 22:42:06.)  Mr. Tomlin is heard saying he was punched in the face a few times. (*Id*. at 22:42:33.)  One of the officers—presumably Officer Percy as he was the only officer present when Mr. Tomlin seems to have sustained the cut above his eye—responded that he did not punch him and Mr. Tomlin called him a "liar" a few times.  (*Id*. at 22:42:34-22:42:44.)  At approximately 10:44 p.m., an ambulance arrived and Mr. Tomlin stood up from the ground and got onto a stretcher.  (*Id.* at 22:43:54-22:44:34.)  When the EMTs asked Mr. Tomlin if he was in any pain, he responded: "Just right there where I was punched in the face, that's all."  (*Id*. at 22:45:55.)

10

Mr. Tomlin was transported to the Mt. Clemens Regional Medical Center where he was attended to by Patrick Flaherty, D.O.  (ECF No. 16-11.)  Officer McCleod stayed with Mr. Tomlin at the hospital.  (ECF No. 16-5 at Pg ID 122.)  The medical record from the hospital lists as "Chief Complaint": "I hit my head."[5] (ECF No. 16-11 at Pg ID 221.)  It further indicates that Mr. Tomlin was in a motorcycle accident" and that he "report[ed] he hit his head on the ground[.]"[6] (*Id.*)  Mr. Tomlin "denie[d] any loss of consciousness[,]" "describe[d] pain to his right forehead, at the site of [a] laceration[,]" and "denie[d] any other pain or injuries."  (*Id.*)  Mr. Tomlin had a 2.9 centimeter eyebrow laceration overlying the right eyebrow, which was sutured.  (*Id.* at Pg ID 222-23; *see also* ECF No. 16-10 at Pg ID 217-18.)  Dr. Flaherty observed "[m]ild nasal bone tenderness to palpation" and was concerned there was a nasal bone fracture.  (ECF No. 16-11 at Pg ID 223.)  He instructed Mr. Tomlin to follow up with an ENT.  (*Id.*)

---

[5] When asked during his deposition about his treatment at the scene and hospital, Mr. Tomlin testified that he did not remember.  (ECF No. 16-6 at Pg ID 148.)  He also did not remember telling hospital staff anything and assumes whatever was reported came from the police.  (*Id.*)

[6] The hospital records also reflect that Tomlin "went around a corner and when the police came around the corner, he was lying on the ground next to his motorcycle." (ECF No. 16-11 at Pg ID 221.)  However, Defendants do not claim in this litigation that Tomlin was in a motorcycle accident or that he was lying on the ground when Officer Percy caught up to him.  Thus, the Court finds it unnecessary to determine how this information was communicated to hospital staff or why.

Mr. Tomlin was arrested for resisting an officer, fleeing or eluding police, operating under the influence of alcohol, and driving with a suspended or revoked license.  (ECF No. 16-5 at Pg ID 118.)  He ultimately was charged with, and subsequently pled nolo contendere to, fleeing and eluding a police officer and operating while intoxicated or impaired, third offense.  (ECF No. 16-6 at Pg ID 140.)

As noted previously, Mr. Tomlin testified during his deposition in the current matter that he did not "have a lot of memory of the whole incident" and if he had not watched the videotapes from the officers' dashboard cameras, he "would have no recollection at all."  (ECF No. 16-6 at Pg ID 147.)  Mr. Tomlin did not recall getting medical care and treatment at the scene or at the hospital or what he told staff at the hospital.  (*Id.* at Pg ID 148.)  He claimed that he was "knocked unconscious" (*id.*) although the dashcam videos reflect that he was conscious at the scene and the hospital records reflect that he denied losing consciousness and was "alert and oriented x3."  (ECF No. 16-11 at Pg ID 221-22.)

## III.   Applicable Law and Analysis

### A.   Fourth Amendment Excessive Force

Section 1983 creates a private right of action against a state official who deprives an individual of his or her constitutional rights under color of state law. 42 U.S.C. § 1983.  Civil liability does not attach simply because a court determines

that an official's actions were unconstitutional, however.  Qualified immunity

shields federal and state officials from civil damages "insofar as their conduct does

not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

"The qualified immunity analysis is a two-step inquiry: (1) whether a

constitutional right has been violated; and (2) whether that right was clearly

established . . .." *Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (citing

*Pearson*, 555 U.S. at 232).  However, a court need not address the steps in order

and may choose to address only one step if doing so "will best facilitate the fair

and efficient disposition of [the] case." *Pearson*, 555 U.S. at 242.  The plaintiff

bears the burden of showing that a defendant is not entitled to qualified immunity.

*Chappell*, 585 F.3d at 907 (citing *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th

Cir. 2006)).

Defendants assert that Officer Percy did not violate Mr. Tomlin's Fourth

Amendment rights but, even if he did, "there is no applicable case law which

would demonstrate that ordering and/or forcing a criminal suspect to the ground

under similar circumstances violates the Fourth Amendment."  (ECF No. 16 at Pg

ID 99.)  The Court begins with the question of whether a reasonable juror could

13

find, based on the undisputed record, that Officer Percy violated Mr. Tomlin's right to be free from the use of excessive force.

Law enforcement officers run afoul of the Fourth Amendment's protection against unreasonable seizures by using excessive force against someone "in the course of an arrest, investigatory stop, or other seizure." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Whether excessive forced was used is assessed under "an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants." *Brown v. Lewis*, 779 F.3d 401, 418 (6th Cir. 2015) (quoting *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013)); *see also Graham*, 490 U.S. at 396. The assessment is made "without regard to [the officer's] underlying intent or motivation." *Graham*, 490 U.S. at 397. It is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and takes into account that police officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

"Three important but non-exhaustive factors guide [the excessive force] analysis: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Goodwin v. City*

*of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (quoting *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2006)).  "Throughout the inquiry, [the court] must carefully balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'"  *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016) (quoting *Graham*, 490 U.S. at 396).  "The ultimate question . . . is 'whether the totality of the circumstances justifies a particular sort of seizure.'"  *Id.* (quoting *St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985))).

Defendants assert that Officer Percy is entitled to summary judgment because Mr. Tomlin has no independent recollection of the incident and therefore cannot refute Officer Percy's testimony that, after several commands to get to the ground, Mr. Tomlin only partially complied by getting on one knee and that Officer Percy never struck Mr. Tomlin.  (ECF No. 16 at Pg ID 95-96.)  Defendants cite three cases to support this assertion:  *Wysong v. City of Heath*, 260 F. App'x 848 (6th Cir. 2008); *Curley v. Village of Suffern*, 268 F.3d 65 (2d Cir. 2001); *Wertish v. Krueger*, 433 F.3d 1062 (8th Cir. 2006).  Defendants might be correct if the officers' dashboard cameras had not captured the incident in the present case.  However, the incident was at least partially recorded and, as discussed further

15

below, what was captured creates a genuine issue of material fact as to whether

Officer Percy struck Mr. Tomlin in the head or face after taking him to the ground.

Before that, the video does not contradict Officer Percy's testimony that,

after eventually stopping, Mr. Tomlin did not fully get on the ground when ordered

several times to do so and got on only one knee.[7]  Nor does the video contradict

Officer Percy's testimony that he put a single hand between Mr. Tomlin's shoulder

blades and pushed him to the ground.  There is no evidence that Officer Percy

slammed, shoved, or threw Mr. Tomlin to the ground.[8]

---

[7] As noted in the factual background section, Mr. Tomlin testified that he immediately and voluntarily lay on his stomach on the ground; however, he also testified that he had no independent recollection of the incident and based what he described on what he saw in the video.  As also discussed, however, the video does not reflect what happened after Mr. Tomlin dismounted the motorcycle, walked away from Officer Percy, and then started to the ground.  Thus, no record evidence supports this version of the events.  Further, in his response brief and through his counsel's arguments at the motion hearing, Mr. Tomlin has argued that, in fact, he got on only one knee after being ordered several times to the ground by Officer Percy.

[8] In any event, as discussed below, Sixth Circuit precedent reflects that police do not use excessive force when they tackle a suspect resisting arrest.  *See Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007) (takedown and restraint of the plaintiff, resulting in a cut and bruising below one eye not unreasonable); *Carter v. Carter*, 728 F. App'x 419, 423 (6th Cir. 2018) (quoting *Radlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015)) ("When a suspect actively resists arrest, the police can use force to subdue him," including using a knee strike and a taser); *Bozung v. Rawson*, 439 F. App'x 513, 520-21 (6th Cir. 2011) (use of a straight-arm bar takedown technique and placing knee or foot on the plaintiff's back, who was being arrested on a misdemeanor offense, held objectively reasonable).

Further, no reasonable juror could conclude that the movement of Officer Percy's left arm, as visible in the video, reflects him striking Mr. Tomlin with his taser and causing Mr. Tomlin's injuries. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"); *Miller v. Gentry*, No. 1:16-cv-707, 2018 WL 11243689, at *2 (W.D. Mich. Mar. 8, 2018) (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1254 (11th Cir. 2013) ("As a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature.")) This is because Mr. Tomlin was face down on the ground, Officer Percy was straddled over Mr. Tomlin's back, and the injuries were located above Mr. Tomlin's right eyebrow.[9] (ECF No. 16-7 at Pg ID 188,

---

[9] When asked at the motion hearing how it was possible that the movement of Officer Percy's left elbow could reflect him striking Mr. Tomlin above the right eye, when Mr. Tomlin was lying face down on the ground, Mr. Tomlin's counsel offered that Mr. Tomlin in fact was on one knee and facing the officer when he was struck. However, there is no evidence in the record to support this. It is contrary to Officer Percy's testimony (ECF No. 16-7 at Pg ID 191), and in the video Mr. Tomlin can be seen turning away from the officer when he kneels to the ground (22:31:48-22:31:49). Officer Percy can be seen immediately forcing Mr.

191; ECF No. 16-10; ECF No. 16-11.)  There also is no evidence to support Mr.

Tomlin's assertion that Officer Percy "pistol-whipp[ed], stepp[ed] on, elbow[ed],

kick[ed], [or] slam[ed] Tomlin's head onto the pavement of the roadway." (ECF

No. 1 at Pg ID 3, ¶ 15.)  Officer Percy denied engaging in any of these actions or

removing his firearm from its holster—which was located on the right side of his

utility belt—during the encounter.  (ECF No. 16-7 at Pg ID 174, 185, 188.)

Officer Percy's testimony is not contradicted by the video.  Nor can Mr. Tomlin

provide contradictory testimony as he lacks an independent recollection of the

incident.

However, there is evidence supporting Mr. Tomlin's assertion that Officer

Percy punched him in the face.  While Officer Percy is never shown on the videos

punching Mr. Tomlin and Mr. Tomlin lacks an independent recollection of whether

Officer Percy punched him, Mr. Tomlin is clearly heard on the video claiming

numerous times that Officer Percy did so.  It is for the jury to decide whether to

believe Mr. Tomlin's on-the-scene accusations.  Thus, the question presented is

whether, under the totality of the circumstances, Officer Percy used excessive force

by forcing Mr. Tomlin to the ground and then punching him a "few times."

---

Tomlin down (*id.* at 22:31:50) and only after are the movements of Officer Percy's
left elbow seen (*id.* at 22:31:52).  Further, the positioning of Officer Percy's body,
particularly in relationship to the ground, makes it implausible that he struck Mr.
Tomlin's face while Mr. Tomlin was on one knee.

Defendants do not answer this question in their briefs, as they take the position that the only force used against Mr. Tomlin was "forcing [him] to the ground" when he refused Officer Percy's commands to get on the ground. (*See* ECF No. 16 at Pg ID 99.)  Nor does Mr. Tomlin answer the question, as he approaches it from circumstances different than what the undisputed facts support: that Officer Percy "pistol whipp[ed] Tomlin" after Mr. Tomlin "had pulled over, conceded the chase, and had knelt down and submitted to the arrest." (ECF No. 17 at Pg ID 376.)  The Court addresses the question now based on the undisputed facts, viewed in a light most favorable to Mr. Tomlin, considering the totality of the circumstances, including the "severity of the crime at issue," whether Mr. Tomlin "pose[d] an immediate threat to the safety of the officer or others," and whether he was "actively resisting arrest or attempting to evade arrest by flight."

It does not appear that Officer Percy (or any of the officers) suspected Mr. Tomlin of a serious offense when Officer Percy activated his siren and lights to execute a stop for a traffic violation (i.e., failing to obey a stop sign).  The officers concluded that Mr. Tomlin did not commit a crime by driving by his ex-girlfriend's house.  However, after Officer Percy activated his lights and siren, Mr. Tomlin led him on a high-speed chase, weaving between vehicles stopped at red

lights, and running through those red lights. [10]  The Sixth Circuit has indicated that

a high-speed chase that leads to a felony fleeing and eluding conviction is a serious

crime.  *Mitchell v. Schlabach*, 864 F.3d 416, 421 (6th Cir. 2017) (citing *Mullins v.*

*Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (implying that a crime's status as a

felony is an indication of its seriousness)).

 While the high-speed chase placed Mr. Tomlin, Officer Percy, and the

public "at risk of severe injury or death," *id*., that threat subsided when Mr. Tomlin

stopped his motorcycle.  The record does not reflect that, after dismounting the

motorcycle, Mr. Tomlin threatened Officer Percy verbally or physically; and, there

is no dispute that Mr. Tomlin quickly got on one knee.  However, the only

evidence presented reflects that Mr. Tomlin actively resisted arrest.[11]

---

[10] The crimes at issue for purposes of the first *Graham* factor are those the officers
reasonably believed had been committed when the force was used.  *See Crawford
v. Geiger*, 656 F. App'x 190, 204 (6th Cir. 2016) (considering what crimes the
plaintiff was suspected of committing at the time she was seized); *Goodrich v.
Everett*, 193 F. App'x 551, 555 (6th Cir. 2006).  Although Tomlin was arrested for
driving while impaired or intoxicated, the facts do not suggest that Officer Percy
suspected him of being intoxicated until after force had been used against Mr.
Tomlin.  (*See* ECF No. 16-5 at Pg ID 121 (indicating that "as [the officers] were
talking to [Mr. Tomlin], . . . a strong odor of intoxicants was coming from his
person" and that they noticed he had "blood shot and watery eyes and had slurred
speech").)

[11] Mr. Tomlin's counsel asserted during the motion hearing that his client was not
resisting and only put his arms up to protect himself from Officer Percy's blows.
Counsel's assertions are not evidence, however, and there is no evidence in the
record supporting his description of Mr. Tomlin's actions.

The Sixth Circuit characterizes "active resistance . . . as 'noncompliance'
that is coupled with 'some outward manifestation—either verbal or physical—on
the part of the suspect that suggests volitional and conscious defiance.'" *Kent*, 810
F.3d at 392 (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir.
2013)). "Active resistance includes 'physically struggling with, threatening, or
disobeying officers.'" *Id.* (quoting *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir.
2015)) (additional quotation marks and citation omitted). "And it includes refusing
to move your hands for the police to handcuff you, at least if that inaction is
coupled with other acts of defiance." *Rudlaff*, 791 F.3d at 641 (citations omitted).
Active resistance "does not include being compliant or having stopped resisting, or
having done nothing to resist arrest, or having already been detained." *Id.* (internal
quotation marks, citations, and brackets removed).

Officer Percy testified, and the video from his dashcam supports, that after
Mr. Tomlin stopped and dismounted his motorcycle, Officer Percy ordered him to
the ground but Mr. Tomlin walked away. Officer Percy repeated the command
twice and only then did Mr. Tomlin get on one knee. Although not apparent in the
video, Office Percy testified that after forcing Mr. Tomlin to the ground, Officer
Percy attempted to handcuff Mr. Tomlin but Mr. Tomlin resisted and, despite
Officer Percy's command to stop resisting, Mr. Tomlin still would not bring his
arm back. Officer Head reported that when he arrived on the scene, Officer Percy

was "on the ground fighting with [Mr. Tomlin]."  (ECF No. 16-5 at Pg ID 122.)

Officer McLeod reported that Officer Percy was "attempting to control [Mr.

Tomlin]."  (*Id*.)  Although the videos from the dashboard cameras of the three

officers' patrol cars do not visually show Mr. Tomlin resisting the officers, they

can be heard telling Mr. Tomlin to "stop it" and "stop resisting."  Mr. Tomlin, who

has no independent recollection of his arrest, is unable to contradict the record

presented by Defendants.

As noted above, Sixth Circuit precedent establishes that officers can use

force to subdue a suspect actively resisting arrest.  *Rudlaff*, 791 F.3d at 642

(concluding that the officers did not use excessive force when they used a knee

strike and then tased the plaintiff); *see id*. at 641 ("Our cases firmly establish that it

is *not* excessive force for the police to tase someone (even multiple times) when

the person is actively resisting arrest"); *Carter v. Carter*, 728 F. App'x 419, 423

(6th Cir. 2018) (holding that the officers did not use excessive force by punching

the plaintiff three to four times when securing his arrest, resulting in the plaintiff

"sustain[ing] a one-centimeter laceration to the forehead and a 'minimal deformity'

of the left nasal bone, which possibly indicated a nondisplaced fracture").  The

Sixth Circuit's decision in *Howse v. Hodous*, 953 F.3d 402 (2020), also supports

this conclusion.

22

According to the plaintiff's version of the events, the plaintiff in *Howse* was climbing the steps to his front porch when several men (later identified as police officers) pulled up in an unmarked vehicle and asked the plaintiff if he lived there.[12]  *Id.* at 405.  After the plaintiff said that he did, one of the officers asked again and the plaintiff replied something like "yes, what the f---[.]"  *Id.*  In response, one of the officers began walking toward the porch, asked the plaintiff again if he lived there, and then told the plaintiff to put his hands behind his back and that he was going to jail.  *Id.*  The plaintiff did not comply and yelled that he had not done anything wrong and he lived at the house.  *Id.*  The officer then ran onto the porch, grabbed the plaintiff, threw him down, and, with the assistance of another officer, attempted to handcuff him.  *Id.*  The plaintiff resisted, " 'stiffening up' his body."  *Id.*  One of the officers struck the plaintiff with a closed fist, which caused the plaintiff's head to strike the porch.  *Id.*

The Sixth Circuit proceeded directly to the second prong of the qualified immunity analysis and found that it was not clearly established "that law enforcement cannot tackle a non-compliant suspect and use additional force against him if he resists arrest."  *Id.* at 407 (citing *Rudlaff*, 791 F.3d at 641-42, for

---

[12] The officers indicated that they were patrolling the area, "known for violence, drugs, and gang activity," and saw the plaintiff "lingering suspiciously on the front porch" of a house that appeared "vacant because it appeared to be boarded up and there were bars on the doors."  953 F.3d at 405.

the proposition that "using a taser or a knee strike against someone who is actively resisting arrest does not qualify as excessive force").  While the Sixth Circuit was considering the law as it stood when the incident occurred in 2016, *see id.* at 406-07, the court did not identify any case prior to its 2020 decision finding the officers' conduct unlawful.  The *Howse* court also did not hold that the officers' conduct was unconstitutional to put police officers on notice moving forward.  Here, Mr. Tomlin does not identify and this Court did not locate a case clearly establishing that Officer Percy's conduct was unlawful at the time he approached and arrested Mr. Tomlin.

For these reasons, the Court is granting summary judgment to Officer Percy on Plaintiff's Fourth Amendment excessive force claim.

## B.    Assault & Battery

"Under Michigan law an assault is 'an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery.'"  *Grawey v. Drury*, 567 F.3d 302, 315 (6th Cir. 2009) (citing *People v. Nickens*, 685 N.W.2d 657, 661 (Mich. 2004)).  "A battery is 'an unintentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person.'"  *Id.* (quoting *Nickens*, 685 N.W.2d at 661).  An officer does not commit an assault or battery when using reasonable force to effectuate an arrest, although the officer may be

24

liable for assault and battery if unjustifiable force is used. *Bennett v. Krakowski*, 671 F.3d 553, 560-61 (6th Cir. 2011) (citations omitted); *VanVorous v. Burmeister*, 687 N.W.2d 132, 141 (Mich. Ct. App. 2004) (quoting *Brewer v. Perrin*, 349 N.W.2d 198 (Mich. Ct. App. 1984) ("It is well-established in our state's jurisprudence that 'a police officer may use reasonable force when making an arrest.'").

Unlike the objective test applied in the context of a § 1983 Fourth Amendment claim for judging whether the force used was reasonable, a subjective test is used in the context of an assault and battery claim under Michigan law.[13] *See Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011) (citing *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 229 (Mich. 2008)). Thus, an officer who believed in good faith that the force used was necessary is protected from liability for an assault and battery claim; whereas, an officer who acted with malicious intent is not. *See id.* (citing *Odom*, 760 N.W.2d at 229). "Michigan law affords officers *greater*

---

[13] In their briefs, both parties employ an objective reasonableness test (*see* ECF No. 16 at Pg Id 105; ECF No. 17 at Pg ID 379), although the objective test was overruled several years ago by the Michigan Supreme Court in *Odom v. Wayne County*, 760 N.W.2d 217, 228 (Mich. 2008). *See Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015) (finding that the district court incorrectly applied an objective test to the plaintiff's assault-and-battery claims and explaining the change in the law pursuant to *Odom*). At oral argument, Defendants' counsel acknowledged the objective test applied and I think indicated that is what his brief followed but that is not correct. Not sure if someone else wrote the brief or counsel just hadn't looked at in a while

protection than federal law." *Marshall v. City of Farmington Hills*, 693 F. App'x

417, 431 (6th Cir. 2017) (Griffin, J., concurring in part and dissenting in part)

(citing *Bletz*, 641 F.3d at 757-58).

For the reasons already discussed, the force used by Officer Percy was

reasonable as a matter of law. Thus, he also is entitled to summary judgment with

respect to Mr. Tomlin's assault and battery claim. *See Estate of Hill v. Miracle*,

853 F.3d 306, 318 (6th Cir. 2017) (concluding that the defendant is entitled to

governmental immunity on the plaintiff's state-law claim of assault and battery

because the record reflected that the defendant "acted in an objectively reasonable

manner with the minimum force necessary to bring [the plaintiff] under control");

*Estate of Sowards v. City of Trenton*, 125 F. App'x 31, 43 (6th Cir. 2005)

(concluding that, because "the officers' use of force . . . was reasonable and

justified . . . the assault and battery claim cannot stand").

### C.     Intentional Infliction of Emotional Distress

While the Michigan Supreme Court has not yet recognized the tort of

intentional infliction of emotional distress, "the Michigan Court of Appeals has

recognized such a tort, and the [Sixth Circuit] ha[s] assumed that the Michigan

Supreme Court would do so too under appropriate circumstances." *Mattis v.*

*Massman*, 355 F.3d 902, 907-08 (6th Cir. 2004) (quoting *Andrews v. Prudential*

*Securities, Inc.*, 160 F.3d 304, 309 (6th Cir. 1998)). Such a claim requires proof

that the defendant engaged in "extreme and outrageous conduct," intentionally or recklessly, that caused the plaintiff "severe emotional distress." *Id*. at 908 (citation omitted).

"The outrageous conduct requirement is satisfied only by conduct that is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Andrews*, 160 F.3d at 309 (quoting *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908 (Mich. 1985)). "Liability will not be found for 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities'; rather, the case must be one in which the facts would arouse the resentment of an average member of the community against the actor, leading him to exclaim, 'Outrageous!'" *Garretson v. City of Madison Heights*, 407 F.3d 789, 799 (6th Cir. 2005) (quoting *Doe v. Mills*, 536 N.W.2d 824, 833 (Mich. Ct. App. 1995)). "[T]he distress inflicted [must be] so severe that no reasonable man [or woman] could be expected to endure it." *Id.* (quoting *Roberts*, 374 N.W.2d at 908-09).

"It is initially for the trial judge to decide whether [the] defendant's conduct might reasonably be regarded as so extreme and outrageous as to allow recovery for intentional infliction of emotional distress." *Sawabini v. Desenberg*, 372 N.W.2d 559, 565 (Mich. Ct. App. 1985); *see also Webster v. United Auto Workers,*

27

*Local 51*, 394 F.3d 436, 442 (6th Cir. 2005) (citations omitted).  The determination must be made by "look[ing] to the context in which the alleged offensive conduct occurred, for what may be extreme and outrageous under one set of circumstances may be justifiable under different circumstances." *Rosenberg v. Rosenberg Bros. Special Account*, 351 N.W.2d 563, 568 (Mich. Ct. App. 1984).  Only where reasonable minds might differ does the question become one for the jury.  *Webster*, 394 F.3d at 442-43 (citations omitted).

In response to Defendants' motion, Mr. Tomlin argues that Officer Percy engaged in extreme and outrageous conduct when he "pistol whipped and slammed Mr. Tomlin's head onto the pavement of the roadway after Mr. Tomlin conceded the chase, pulled over his motorcycle, and kneeled down to be arrested and handcuffed."  (ECF No. 17 at Pg ID 381.)  As discussed above, Mr. Tomlin's claim is premised on facts not supported by the record.  Mr. Tomlin also does not cite a single case suggesting that these purported facts—even if supported— constitute extreme and outrageous conduct as a matter of law.  In fact, the undisputed facts do not reflect extreme and outrageous conduct as a matter of law.

As discussed above, police officers may use reasonable force to arrest a resisting suspect.  Case law establishes that the force used here was reasonable under the circumstances.  Therefore, Officer Percy's conduct could not be deemed extreme or outrageous.  *See Carter*, 728 F. App'x at 423-24 (concluding that the

28

defendants were entitled to summary judgment on the plaintiff's intentional infliction of emotional distress claim where the force used was found necessary to secure the plaintiff's arrest); *Hopper v. Plummer*, 887 F.3d 744, 760 (6th Cir. 2018) (explaining that where resolution of the state-law immunity issue is heavily dependent on the same material facts as an excessive-force determination under § 1983, the "statutory immunity defense stands or falls with [the defendant's] federal qualified immunity defense").  While some of the statements by the officers at the scene give the Court pause, it is not clear which, if any statements, were made by Officer Percy.  Moreover, liability for intentional infliction of emotional distress does not extend to "mere insults, indignities, [or] threats[.]"

Therefore, the Court is granting summary judgment to Officer Percy on Mr. Tomlin's intentional infliction of emotional distress claim.

## IV.   Conclusion

In response to Defendants' motion, Mr. Tomlin concedes that his claims against the John Doe defendants and the City of St. Clair Shores should be dismissed.  For the reasons set forth above, the Court concludes as a matter of law, based on the record evidence, viewed in a light most favorable to Mr. Tomlin, that the force used by Officer Percy was not excessive.  Therefore, the Court grants summary judgment to Officer Percy on Mr. Tomlin's Fourth Amendment, assault and battery, and intentional infliction of emotional distress claims.

29

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (ECF

No. 16) is **GRANTED**.

s/ Linda V. Parker

LINDA  V. PARKER

U.S. DISTRICT JUDGE

Dated: June 20, 2023